Good morning, Your Honors. Tim Scott for Mr. Barajas. I'd like to start with the first assignment of error that was raised in the assignment briefs, and that is the exclusion of medical records and the evidence that was contained in them, all within the context of a diminished capacity defense. What I start with for the court is the proposition that, as a matter of law, medical records are business records that are admissible, and particularly admissible when the defense is putting on a mental state-type defense. So we start with a proposition that it is not hearsay, or it's non-hearsay, and when it's relevant, as it was here, it should be admitted. In addition to that rule of law, if there's any concern about how to apply it or any question about how to apply it, I would cite to the court the policy that overarches mental state-type evidence. And that policy has been described by this court in the Ives case and in the Hartfield case and in the Rooster case as a, quote, explicitly liberal policy in favor of letting in evidence that might suggest or shed some light on the defense's mental state or their mens rea in a particular case. In this case, in the case at Barr, Mr. Barajas was not permitted to introduce what I think is admittedly relevant evidence from his own medical records that were generated right at the time of his arrest by a medical facility, and he was deprived of the opportunity to put that before a jury. The relevance of it is twofold, and the importance of it is twofold, both in the context of the simple assignment of error, but also in the context of harmless error. And that is this. It was those records and the facts within them, and in particular some facts that I'll describe in a moment, both corroborated Mr. Barajas' mental defense, specifically that he was delusional, that there was some ideas, some evidence that he was psychotic. So in a general sense, it corroborated those ideas and that defense. But then more specifically, it rebutted and it answered what became the government's main theme, and I would submit most powerful theme and theories in terms of the way that they tried the case and in their attempts to tear down his mental state defense. What I mean by that is to the second, is to the specific rebuttal that it would have provided, is that throughout the case, the government made much of the fact that Mr. Barajas, quote-unquote, seemed normal and seemed coherent, and also that he apparently failed to reveal his specific delusions to the primary officer when he applied for entry at the port of entry, and to the secondary officer when he was taken to secondary, and then to the interrogating officer after that. Through each one of these witnesses, and this is contained in the ER at ER 76 and 83 and 84 and 92, just by way of example, the government basically made the point, if he was really delusional, if this was real, then wouldn't he have told somebody? Wouldn't he have said that at the port of entry, said that people are chasing me and they've harvested my kidney and the CIA has asked me to cross into the United States? And the government made a lot of hay with that type of idea, to put it colloquially. What's so significant about the medical records is that not only do they show he made statements exactly consistent with those delusions, everyone is after me, I believe I'm missing my kidney, and statements that were described as delusional, but perhaps more importantly, the medical records revealed that he wouldn't reveal those delusions unless he was specifically asked. And this is at page 308 of the ER, where the evaluating doctor writes, quote, when specifically asked, Mr. Barajas endorses delusional ideas, specifically that everyone is after me, etc. And another quote is that that's, quote unquote, with reluctance. So what that does is show it's exactly consistent with the defense that Mr. Barajas was presenting, that he did have those delusions, they were real, but his delusional structure was such that he was hesitant, reluctant, in the words of the doctor, to just blurt them out to the first person that he saw. So it would have been reasonable that he wouldn't have told the Border Patrol agent about these delusions, that based on sort of the delusional structure he was suffering under, that he wouldn't necessarily have brought that to somebody's attention, because presumably he didn't know, sort of within the world that he occupied, such as it is, who to trust and whom not to trust. So it was, kind of to sum up that point, it's relevant, legally speaking. It's assumed they had introduced the medical records. Are you suggesting that if they had introduced the medical records, then the jury would have believed that somebody beckoned him across, at least he thought so, and that's the only reason he crossed, because he saw the person beckoning him to come across to the United States, and therefore, they would have found him not guilty? Right. Is that the essence of that? The essence is, and to make sure that I'm answering the court's question, I'm not arguing. I'm not suggesting that it has to be what I'm saying, but I wish you'd tell me what the essence is. I'm just telling you what I assume it is. Right. What we're not arguing, and I want to make sure I'm not misunderstanding the question. What I'm not arguing is that someone really was beckoning him across the border, that he was actually brought over by the FBI or anything like that. It is specifically what he thought what was going on in his head. If the court's question is more along the lines of – That's what I assume you were saying. Right. And it's that he was – And so the jury would have believed that and said, all right, he didn't cross the border, and he's not guilty. He's not guilty because he didn't have the specific criminal intent to violate the immigration laws. That's really the heart of it, and I'll address that later. But they have to ignore this. You know, I know where you're going. I've been here before. Right. I'm going to keep coming back, all of those things. Wouldn't they have had to ignore all of that, too? Your Honor, they wouldn't have had to ignore it. I'm sorry. I didn't mean to cut you off. No. Go ahead. They wouldn't have had to ignore it. What they would have been given with those statements from the medical records is a context in which to evaluate those statements. Given the fact that according to the delusional structure that Dr. Myers described, he did believe that he had made prior efforts that were rebuked, and he did believe that it was imperative that he get across, and the CIA and FBI did want him to get across. So it's not sort of the smoking gun that it was presented as to the jury that he said, I've been through this before. I'm coming back. Therefore, the delusions aren't true. If armed with the evidence in the medical records showing exactly what they were and the fact that he was adamant about them and that he wouldn't reveal them immediately, it makes some sense, and it can sort of be fit into that structure that based on his delusions, he's going to keep coming back because he thinks the FBI and the CIA want him to. Mr. Scott, you know, there's a lot of technical stuff in these records, and the Court is saying that the Court's exercising its discretion to say I'm not going to have this admitted before the jury gets the records. If you want to call the doctors, go ahead and call the doctors, or whatever. It seems to be a fairly reasonable approach to getting just these rash of medical records into evidence. Right. Now, if I wanted to dump in the entire document, which is memorialized as ER 302-311, I think, frankly, it would be a closer call. I mean, I would argue to the Court that it's not that outside. Okay. But you just want to get in these two statements you're talking about? In candor, you know, I would have settled for that, to be honest with you. And you could have called the doctor who would have said this is what the fellow said to me. Well, who I called was because the Court did express that concern. Doesn't there need to be some explication of this? And so what I did is hire a forensic psychologist. Now, granted, not somebody with an M.D., but somebody who for years, if not a decade and a half, had worked for San Diego Superior Courts, made a career out of taking medical records and then explaining in layperson terms what this means and using them to make a psychological diagnosis. So I did hire a doctor of psychology to do exactly that. And you proffered him as a witness to come forward? That's right. That was Dr. Judith Myers, who did testify at trial. What's significant is once the Court had made its record and its ruling that I sort of, you know, submitted the issue over objection that I couldn't get the records in, I said, fine, I will use Dr. Myers. And at a minimum, she should be able to, number one, diagnose delusions and psychosis and then say, and here's why I think that, is because, you know, as a forensic psychologist, what I do is look for records and here's the specific evidence that I'm pointing to. And what she would have done, if I had my way, was to document and point out to the jury exactly what evidence that was created at the time of his arrest supported her diagnosis. Well, that's going a little farther, I think. But you've got another ground of error here, and this was the district court's refusal to permit the evidence of the delusional statements six months before, three months before. That's right. Or a few weeks before, I think, maybe, and maybe something after. That's right. They wouldn't let any of that stuff in. That's right. And the unfortunate part of that is that it sort of compounded my first assignment of error. It became somewhat of a catch-22 for Mr. Barajas. He was prevented from putting in the contemporaneous evidence, what the forensic psychologist described as a snapshot of what happened exactly at his arrest, as memorialized in the medical records. But then on the other hand, you know, once deprived of that, the Court turned around and said, but at the same time, if you try to have the psychologist discuss the delusional structure that she identified six months after the arrest, that becomes too remote in time. So I think the Court said he's had six months to think about this. That's hearsay, and it's not coming into evidence. So the doctor wasn't allowed to describe the delusional structure as it existed after his arrest, six months after his arrest, and I wasn't permitted to put in evidence that existed at the time of his arrest. And at the same time, his sisters were only permitted to discuss how he acted right around his arrest under the same theory. And this is memorialized at page 56 of the ER, where the District Court said, sort of laid down the gauntlet in its view of the law, I am concerned about temporal nature, is what the District Court said. I don't want to hear a statement three months after or a month before. I mean, that's in black and white at page 56 of the ER. What the Court said is it needs to be right at the time of the arrest, in essence. Now, what this Court has held squarely, I would say, in Ives and in Hartfield, is that that's not the law. The law is whether before, during, or after the arrest and the alleged crime, any evidence that reflects on one's mental state is admissible. Again, under this explicitly liberal policy that the Court has adopted when it comes to a men's rate of an offense. And I would just point out that this isn't some insanity hurdle that we're trying to get over. This is an element of the offense, that he had the specific intent to do this. So I would argue that becomes even more germane and even more important to be able to combat that, when it is an element that the government has to prove. I think I left a thread hanging that the Court discussed. Could you have called the medical doctor to trial? That's essentially the heart of the government's argument. The government doesn't exactly use a rule of evidence or suggest that there's a legal requirement to do that. It just says, in a general term, the appropriate way to put in this evidence is through that doctor. Well, as a legal matter, the rules of evidence say otherwise. I mean, it's simply a business record under 803-6, and it's perfectly appropriate. And I proffered the correct custodian of records declaration under 902-11 to get those into evidence. So really, as an evidentiary question, there's no problem whatsoever with putting that in. Now, if the question is, why not just call the doctor, sort of the back story of that is, well, it's a medical doctor who's not happy about coming in to court in general. They want to be paid for their time, and they're a little bit irritated, and I would put to the Court becoming hostile at the idea of being drug into court. At the end of the day, the evidence I wanted was in black and white, memorialized in a report, and it should have come into evidence. Now, if the government's concern is, well, we don't want the defense to twist the meaning or to twist the words of the report or to put in snippets of the report that somehow misconstrue what it means, there's a remedy for that under the rules of evidence, and it's Federal Rule of Evidence 106. If the government thought that I was trying to twist anything or that my portions that I wanted the jury to hear were incomplete, they have at their disposal the rule of completeness under 106, and they certainly would have been at liberty to put in anything that they wanted  And you were given the opportunity to redact the documents, were you not? I certainly could have. And if I was allowed to put in the documents as physical evidence, I would have redacted portions that the Court thought were unreasonable or prejudicial. Well, if you had redacted the documents to get rid of all of the jargon and all of that stuff, then the Court's exclusion of the evidence because they were confusing it with a lot of medical jargon, that would have gone by the boards. Correct. And it sounds to me as if then you had the business records exception satisfied by the declaration that you had. Exactly so. The redacted documents would have come in, it seems to me, but you didn't redact them. I would have. If the Court had cited to some specific portions that it had concern of, that would have been the procedure. And I cited to the Court, to this Court, United States v. Nick, to stand for the proposition that if a district court has some specific concerns about confusing material or prejudicial material, the practice is to redact those portions and to let in the documents, not the wholesale exclusion that happened at the district court level. But by the time we actually got to trial, the procedure that I wanted to employ was simply to verbally let the jury understand by someone who would review the records and the hearsay exception that they were, to state what parts in there were important. So kind of the rubber met the road in terms of the legal significance of this when it came to the mistake of fact instruction. Although I was deprived of a good deal of the evidence that I wanted to show the jury in terms of the delusional structure, there was still some evidence, not enough for my purposes to be an effective advocate, but there was some evidence that he did believe that the federal government wanted him to cross the United States border and, in fact, had given him leave to do that, had given him the nod, both as a matter of an expression but also literally, at least in his mind. What we were dealing with was sort of a grand metaphysical, if you will, mistake of fact. He thought that as a factual matter, he did have the permission of the federal government. And that is the first element of an attempted entry offense. Under Gracita Zulaberry, it is a specific intent offense. Not all the circuits agree with that, but that is the en banc holding in this court, is that it is a specific intent offense, and specifically, it gives rise to a subjective mistake of fact defense if the facts merit it. If the facts did merit it, I did ask for the mistake of fact instruction. It would have directly negated the mens rea of entering without permission if he thought that he did have it, and the district court denied it. The district court was of the view that a mistake of fact would have to be where the United States border is or something more tangible, but the fact is consent to enter is an element, and it is a fact that he misunderstood because of his unfortunate delusion. Yeah, but even if he had thought that, it's permission from the attorney general. That's not a nod from a border patrol agent. Even if the border patrol agent had in fact nodded to him and we had this, it was vigorously winking and nodding and gesturing. That wouldn't be a defense to anybody, much less your client. An interesting point that the court raises is the CIA, the FBI, the border patrol, basically do they have leave to consent to entry on behalf of the attorney general? That's not a point that was raised by the government in the district court or even in their briefing, but I'll answer the question to the extent that I can. I should just point out that the government attempts to reserve two minutes for rebuttal, but that being said, to answer the question, most recently, and I'll put the citation down, this court decided United States v. Smith-Baltahare, and that was on this Friday. That's a September 9th decision by this court, and in that context, there was a claim that the defendant thought that he was a United States citizen, that there was some derivative citizenship type question. And the government's response to that was, well, what he's making is a mistake of law, that essentially you can't, it doesn't negate the element, much similar to the argument or at least to the hypothetical posed by the court. Well, even if that's true, that's a mistake of law that an FBI or a border patrol agent can give permission to cross. What that panel held squarely was that when it comes to an element of the offense, a mistake like that becomes a mixed question of fact and law. You can frame it as, did the defendant think that once an FBI or CIA or border patrol operative gave him permission, was that legally sufficient to have consent to enter the United States? That's not purely a question of law. I would submit, not purely a question of fact, but a mixed question of fact and law that the Smith-Baltahare holding squarely says does give rise to specific intent. Because it is a specific intent, the touchstone is criminal intent. If he thought that he had permission, whether that's writ large in terms of border patrol, FBI, the federal government writ large, or whether he had permission from the Attorney General itself, if he was not attempting to break the law, but instead thought he was acting at the behest of the federal government, that still is a defense as a mixed question of law and fact. And with that, unless it's for the question, I'd like to reserve my remaining time. Just on the case, have you submitted a 28-J letter on that one? I didn't because it came out Friday. I will do it when I return to my office. But as I say, it's a Ninth Circuit case from Friday, September 9th, and I may even have the Westlaw citation. I'll bring that to the Court. Okay. I'll reserve my remaining time. Thank you. Good morning, Your Honors. May it please the Court, Mark Rahe for the United States. Your Honors, to get right to the heart of the issue number one, the district court did not exclude those medical records because it found that they were irrelevant. It relied almost primarily on a Rule 403 balance. This Court has stated that it gives a special deference to a district court's Rule 403 balancing, especially when it's expressly stated on the record, as it was here, in Supplemental Excerpts of Record 93 to 94, where the Court held, quote, that under Rule 403, the danger of misleading the jury, that the legal terms interspersed throughout the reports substantially outweighs the probative value of these records to be presented in this form. Now, I particularly would highlight the last few words that the judge said. The judge never held that these records were categorically inadmissible. What the Court said was, look, there are all kinds of legal jargon and medical jargon interspersed throughout here. You need to call a witness. And it's interesting because February 18, 2004, was supposed to be the original first date of the trial. The trial ended up getting continued three months, four months to June. When this issue was litigated, the district court could sense, look, the district court basically said, you need to call a witness. And I find it interesting that defense counsel actually represented at that time that he would go for it in this grounds. And I cite Supplemental Excerpt of Record 102, where the defense counsel says, to bring the court up to speed, it has become clear to me at least, that according to the government and the court, and I accept that, that perhaps the best way to proceed, if I do endeavor to put in some of these statements, that I submit are relevant and integral to the defense, is to use the actual hears, for lack of a better word, the actual witnesses in live testimony. I am more than willing to do that. And then the trial was put over three months, and yet there is no Dr. Barrera, that's one of the treating physicians from the Alvarado Parkway Institute, or Dr. Flugels. Three months to call those witnesses. He basically stated that he would, and yet he didn't. Now another interesting point that comes up, Judge Thompson asked about redaction. And I noticed this also in the reply brief. Well, hey, if there were problems with something that was in this evidence, the district court could have redacted. I would also point out to the court, at that same February 18th, 04 hearing, the government specifically offered to go that route. And defense counsel rejected it. And I would point out again, the Supplemental Excerpts of Record 107, where the ALSA, the AUSA, suggested that, quote, in the interest of proceeding forward today, the government is willing to enter into a stipulation regarding some specific statements that the defendant made to this treating psychiatrist on September 6th. And what is the court saying? Mr. Scott, would you be willing to stipulate to redact? Mr. Scott answers, I think at this point, I'm becoming convinced that we had better do it through witnesses. I think that that's, I think that is kind of the tenor of everything this morning.  In his last sentence, I think we have to do it that way. Now, Your Honor, I would submit to you that on this record, especially when you have a deferential abuse of discretion standard, the district court proceeded in a reasonable way. I have a copy of those records. I went through there. There are all kinds of strange medical concepts in there. In this, there's a case that the defense cites Blalock. Blalock involved a physical injury, not a psychological injury. And plus, the medical records in that case were written for an insurance company. And this court expressly noted that they were written in plain language. These records were not written for an insurance company. They're medical records. They had all kinds of jargon and confusing information. The district court is in a good position to note that. He gives the defense an opportunity to call the treating physicians. The defense represents on the record that he would do that. And yet three months later, when trial starts, it's back to square zero, trying to get these records in through the back door. But now this is an even more important point I have to say about these records, Your Honor. And it's basically harmless error. And I would submit to you that there's not a single key fact in those records that wasn't introduced at trial through other witnesses. And in that case, there's no harmless error. And what about the statements before and after of a delusional nature? We'll just assume that's what it would have been. And the district court excludes those statements. There's one made, what, six months, one three months, one a few weeks, I think, before. And we have cases that say, well, we accept statements of delusional or mental illness a couple of years after the event. How do you get around the court not having committed error by excluding those statements? I'm glad you bring it up, Your Honor, because you know what? The district court still let in a substantial amount of evidence. The district court did what? I'm sorry, I can't hear you. The district court still allowed in a substantial amount of evidence. It allowed some. Well, I would say a lot. And, in fact, this Court stated there's Jessica Cronin, the defendant's sister, was allowed to testify to multiple phone calls that she received in August and September immediately before the incident. The sister. And I'm reading up both of them. Both sisters. And in these, I mean, the testimony was very detailed. Jessica Cronin talks, you know, that the defendant was at dinner in Mexico and some people gave him some food, and he wasn't hungry, and he gave food to the dog, and he saw the dog pass out a few minutes later, and he saw the baby pass out. He thought that they were trying to kill him. On another phone call, supplemental excerpt of record 633, according to her, he's on the phone. His voice is going fast, probably. Well, are you arguing that because the Court let a good deal of this information in, it didn't have to admit this additional information? It was cumulative or something? Yes, Your Honor. And, you know, I would note at no point, I mean, when we talk about what was excluded to the defense investigator, I wasn't a trial prosecutor on this case. I conducted what I thought was a thorough review of the record. I don't see any proffer of what the substance was to that defense investigator, and I don't see any argument as to how what was so critical about that, those delusions. When you look at the record through Jessica Cronin, one sister, through Grace Barajas, another sister, also there was a letter that was admitted. Let's look at record 391. In fact, the defense blew this up and used it as an exhibit. This was one that he wrote when he was at the Alvarado Parkway Hospital. One of my sisters is targeted for abduction. Maybe both. Please contact federal authorities. He talks about watch the border for him. The abductee will be a victim of snuff porn or organ harvesting. All of this stuff about organ harvesting came in. It came in through those sisters and not just those lay witnesses. It came in through Dr. Myers' testimony. She talked about the organ harvesting, the FBI, the CIA, the snuff pornography. So your argument is even if the temporal basis for the district court's ruling was not appropriate, the evidence that was excluded was merely cumulative and not all that important. Yes. And I don't see any argument to the contrary because the jury had all of this evidence in front of them. And I would submit that the testimony of those sisters, we're looking at a cold record. They're talking about he's on a pay phone. He's saying they're after me. They're after me. They're shooting at me. And then the phone line goes dead. I mean, I can only imagine how dramatic the impact of that testimony was. There was substantial evidence of the delusions. But even more than that, defense counsel, when you talk about that first issue, he says, what was so important about that Alvarado Parkway records? Not only the evidence of delusions, and in his brief he talks about also the drug use and the alcohol use. Well, you know what? That came in also. It came in through Inspector Gale that he admitted that he used meth daily for the last two weeks. It came in through Dr. Myers that he was addicted to methamphetamine and that he used alcohol a lot. But even more so than that, what is defense counsel saying is so critical? That he couldn't rebut the government's theory that the defendant looked normal and gave responsive answers. And I think according, he would have this court believe that he had no other evidence in the record. And I would submit to you that that is directly contrary to the state of the record. He went over this exact same issue with Dr. Baraha, or Dr. Myers, and he did it at length. He had her on the stand, and again, you've got to compare. He wants one sentence from a cold record without explanation from one foundational witness. He has Dr. Myers' testimony that goes on for pages. And I would say specifically it goes from SER 743 to 46, and also again on redirect to SER 767 to 69. And specifically, defense counsel had Dr. Myers address the fact that all the government inspectors in this case testified that the defendant appeared normal when they interacted with him. Question, have you been made aware of the fact that according to them, Mr. Baraha appeared normal? Answer, yes, I was made aware of that fact. Question, were you made aware of the fact that apparently a series of questions were asked back and forth between the officers and Mr. Baraha? Answer, yes. Question, about where he was born or where he was going? Answer, I was made aware of that. Question, and were you made aware of the fact the defendant appeared to answer those questions normally and didn't otherwise appear crazy for lack of a better word? Answer, yes. Question, does that affect your opinion in any way? Answer, no, it does not. But the doctor didn't just stop at that. She explained why, and she specifically put into the record the theory that the defense claims, which is that with this encapsulated delusional disruption disorder, a defendant doesn't just volunteer the evidence of a delusion. He has to be specifically asked about it. And again, I would point supplemental excerpt of record 767, the question on redirect. Why isn't it inconsistent with psychosis with delusions to be able to answer and respond to questions? Answer, because a person can answer short, structured questions as long as it doesn't touch on their delusion. And I would submit that supplemental excerpt of record page 769 is perhaps the most powerful evidence. She again testifies, quote, the delusional disorder is more encapsulated, so the person can have average functioning in other areas of their life. And this is what's important. And only when you start asking about the delusional disorder do you get the bizarre responses. I would submit to your honors that is exactly what that one sentence from the Alvarado Parkway records that was excluded states. And what did it say? One specifically asked the defendant endorses with reluctance these delusional ideas. So on this record, it's not fair and it's not accurate for the defense to claim that they were deprived of this crucial evidence to rebut a key government theory. They're saying, they're asking you to take one sentence, a cold sentence is what I call it, from an excluded record and say that that was so critical and just ignore this other live evidence from a qualified forensic psychologist. In fact, he was the only expert who testified at trial, which is a point that they repeatedly made. So on that record, your honor, and also the last thing I would say, in closing argument, defense counsel did argue that theory about what Dr. Myers had talked about. And that's a supplemental excerpt to the record, 830 to 31. When he addresses the point, you know, the government is saying that my client looked normal, quote, and then he goes on, when you have psychosis with delusional disorders and when it's what the doctor described as encapsulated, you're not going to tap into that with straightforward, directed questions. It's when the questions become open-ended, when you get Mr. Brahas to open up about it, that's when the thinking becomes delusional, disorganized, loose associations in the ideas of reference. That diagnosis is completely consistent with this notion that he appeared normal. So place those on the scales when you consider that idea. So with that, your honor, I'd move on from issue one. I don't believe there's any grounds for reversible error there. Now let's talk about the instructions. Now, when I reviewed this case, I found it most interesting. At the jury instruction conference, this mistake of fact instruction was proffered and it was denied. But the defense never identified at that point that that was their theory of case instruction. And that's a supplemental excerpt to record, page 797. Instead, at that conference, the defense proffered that their theory of case wasn't so much the mistake of fact as it was the lack of specific intent. And I would proffer again, that's supplemental excerpt to record 800. This is a direct one-sentence quote from the defense counsel. Our theory of the case is that he was motivated by delusions, that he did not have a specific intent to enter, and that if you do not find beyond a reasonable doubt that he had the specific intent to break the law, then he's not guilty. In other words, specific intent, specific intent, specific intent. That was the defense. That's an element. All this delusion showed that the defendant didn't have that element. Therefore, he should win. The defense proposed two separate instructions. I would say number two and number four. And this is a supplemental excerpt to the record 851. The district court read those instructions into the record. And you look at the instructions that were actually given, and it's in the, again, it's around supplemental excerpt to record 850, 851. The court gives the five, the standard five-prong element test from the Ombakopinion and Brasidas Ulibarri. But he doesn't stop there. The next page, he gives three separate sentences that focus on the specific intent defense and spell it out in full. He says, to find a defendant guilty of attempting to reenter the United States, you must find that Mr. Brahaus had the conscious desire to reenter the United States without consent. This means that he specifically intended to enter the United States without consent and had criminal intent in doing so. The next sentence is almost verbatim with defendants proposed during instruction number two. If you determine that there is reasonable doubt that Mr. Brahaus had the specific intent to violate the immigration laws of the United States, that is whether his purpose was to engage in criminal conduct, you must return a verdict of not guilty. And the court doesn't stop there. The next sentence is defendants proposed during instruction number four. You may consider evidence of intoxication or abnormal mental condition in deciding whether the government has proved beyond a reasonable doubt that the defendant acted with the conscious desire to enter the United States without consent. So what do we have so far? We have the defense identifying during instruction conference what his theory is, specific intent. Now we have the district court providing extensive instructions on specific intent. And, in fact, the majority of the ones that the defense submitted. And final, the final piece in this puzzle, at closing argument, the defense counsel, excuse me, vigorously argued specific intent. And he even referenced that instruction. In particular, supplemental excerpt of record 821. Defense counsel states, what it boils down to is not whether Mr. Brahaus gets to be here because he doesn't and he won't. It's whether he had the mental state, the criminal intent, to violate the law. The question fundamentally is, did these delusions, did this psychotic condition, this drug-induced psychotic condition, and it's his fault and he's open about that, whether this condition motivated this trip across the border. On that record, Your Honor, this Court knows one of the most fundamental precepts governing jury instruction claims is even if the defense doesn't have a right to an instruction, an exact choice of wording that he wants, so long as the other instructions adequately cover the defense theory, there's no error. I would submit to you that where the defense identifies at the jury instruction conference that his defense, theory of defense, has specific intent, where the district court instructs on that, and that where counsel is, in fact, able to argue that, there is no error here. But I would still like to make a couple more points about mistake of fact, and particularly issues about this recent case, Smith-Volta here, that was decided a couple days ago. I reviewed that case. I don't think it hurts the government, and if anything, I think it might have issues with the defense. In that case, it's interesting. The Court states that the mistake of fact has to be reasonable. Now, I know that's sort of an open, open issue, and the briefs didn't really discuss too much about mistake of fact. But in this case, the defense has effectively conceded that this was unreasonable, that it was honestly held, but that it was unreasonable. In fact, now, it's interesting to find that they're opening brief page 39, but the slip opinion at page 12892 states that, and this was Judge Reinhardt's opinion, assuming that the defense can show reasonable mistake, he should have gotten that instruction. That's one grounds of distinction. The other fundamental grounds of distinction is that in Smith-Volta here, the evidence was completely shut down. In that case, the government had argued offensive collateral estoppel below, and at that time, that was governing the law. After the trial, there was a pending en banc case about that issue. The federal government flew in or threw in the towel and said, you know what, we're not, we're no longer using collateral estoppel. But because the district court in Smith-Volta here had adopted that, it excluded all evidence whatsoever. And this goes back to the point that I made to Judge Thompson a few minutes ago. In this case, if the record is given a fair reading, there is substantial evidence of delusion that was allowed. And also, it's interesting, in Smith-Volta here, the district court specifically said, you know, if I'm wrong about this, we're going to have the pleasure of meeting again. I mean, the district court was pretty much clear on the record that if I'm wrong in excluding any evidence of your reasonable belief that you're a United States citizen, it's reversible error. This case contains no such comparable point in the record. And, in fact, I would submit that the district court repeatedly stated throughout these proceedings that it understood that because this was a specific intent case, that there had to be evidence on mental state. And perhaps the only quote I'll read here, and the best one, is in Supplemental Excerpt of Record 100, a short sentence. The court recognizes the defendant has a due process right to present state-of-mind evidence on a specific intent of crime. In this case, the court bent over backwards to try to make sure that the Rule 403 concerns were met. It allowed the defendant to introduce substantial evidence of his delusions through both his sisters, through the letter that was admitted at ER 298, and through his expert witness. Nothing of the sort happened in Smith-Baltiher. And finally, Your Honors, I know Judge Breyer brought up a point I also wanted to underscore. There was very little evidence about what he thought the consent was. At no point in the record did he say it was the attorney general. That's what the plain language of the statute says. Even if you read what's still evidence there is in the record about consent, about, oh, it was a nod of a tourist, and therefore, I thought I should go, that's not – that doesn't comport with the law. And another important distinction is Smith-Baltiher, his problem with consent was that he had a reasonable belief that he was a U.S. citizen. If you're a U.S. citizen, you don't need consent, period. That's what's a key distinction between that case and this case. And that's why there it didn't matter that he thought he had the consent. It didn't matter in Smith-Baltiher who he thought he had the consent from, because the issue there was that he reasonably believed he was a U.S. citizen. If you reasonably believe you're a U.S. citizen, you don't need anybody's permission to come to the border. In this case, there is no such claim that he reasonably thought he was a U.S. citizen. So even if he had whatever, you know, paranoid, delusional inference of consent, it wouldn't even be the kind of consent that the law requires under Section 1326. You've got just seconds. He's coming back to it. But what are the two – you've made what I think to be boiled down to two main points. Can you just give him those two points? Maybe you think you've made more than two main points. Just on the points so that he can rebut. He's saying that there was an error, that he had a report that should have come in. This record suggests that he wasn't precluded from presenting that report. He could have. He had to do something in order to do it, but he wasn't precluded. But you've made the points. You make the arguments so he can rebut it. Just quickly. I would do it. The two – I would want to know what the answer is. With that Issue 1, when the district court said not categorically denying it, you just need a witness. When the defense counsel said, okay, I'll get you that witness, three months later, he doesn't have the witness. How in those situations, in those circumstances, did he complain of error? And secondly, I would say with the injury instruction, how when he identifies his defense at the jury instruction conference as specific intent, now the failure to give the mistake effective instruction suddenly becomes the defense theory of the case. Thank you. Mr. Scott, the reason I wanted to summarize it, because you've got just a short time, and he said a lot, but I think he was making two basic points. And let me attempt to respond to those as best I can. The short answer is I did get a witness. I got Dr. Myers, who's a forensic psychologist. It's true at the time that the district court was making its rulings in an attempt to put on the trial, such that I was permitted to put on the trial, I said I will explore the live witnesses. And as I said, it's not in the record, but it is kind of the back story of this. They were hostile. The government had gotten to them. They wanted money to come to court, and they were hostile to me. So I just wanted to use what was in black and white in the records, and that is perfectly permissible under the federal rules of evidence. And if the government thought that I was twisting anything or thought that that was incomplete, they could have rebutted that either through the records or through the live witnesses themselves. Lest there be any concern, because I think sort of the overarching theme that the government is sounding and maybe the district court was concerned about is, well, get a witness here so that you're not twisting the language of the reports or you're not misleading the jury. I mean, I think under 403, that's the analysis. Is it misleading? And I just invite the court to look at ER 302 through 311 and see if it's misleading. What exactly is in black and white in there? I should also note, just sort of almost parenthetically, that the district court itself, sua sponte appointed a doctor to do a competency evaluation, Dr. Zilberman of the MCC. His report begins on page 313 of the ER. Dr. Zilberman himself used the same records, reached the same conclusions, delusions with psychosis, and he didn't think there was anything misleading about that. I would point, and I realize time's running short, but just to rebut the sort of harmlessness, cumulative argument to that, the defense didn't get to get in a lot of other evidence. In fact, when Dr. Myers finally was able to begin to describe the actual delusions themselves as a doctor, the district court revisited that issue the next day and said, no, you don't get to talk about any nods or permission. You don't get to talk about those delusions in closing arguments. And if I might, that would be memorialized on page 247 to 258 of the ER. So I was, again, without that kind of evidence and hamstrung in my ability to present it to the jury. To say nothing of the fact that the government, in conclusion, made much light and a lot of hate, I say again, about the fact that there wasn't contemporaneous evidence. I cited page 279 of the ER, where in summations the government savages my expert and her conclusions by saying, but she only really talked to this defendant for two and a half hours. And critically, he didn't explain, the defense counsel didn't explain, why he failed to provide his own defense expert with perhaps the most critical information. That is, what this defendant did and what this defendant said, aside from self-serving statements he wrote after the offense and any stories he might have told to her after having the leisure of seven to eight months to concoct a story. So Dr. Myers was described as a two-legged stool, and that's also in the record. We're just having no foundation for our opinions. The foundation was there. It was memorialized in medical records. And again, the government is unable to really rebut this. It's the key point that he was reluctant to describe those delusions. The government says, well, Dr. Myers said that with an encapsulated delusional disorder, that's the way it looks. You would be reluctant to describe those. And the government suggests that it's harmless because Dr. Myers said to the jury, that's what an encapsulated delusional structure looks like. The problem is there's no facts. It's just as simple a difference as facts in the record and a general opinion by a doctor. I can have the doctor talk all she wants about what, generally speaking, an encapsulated delusional structure looks like. But what I needed and what the jury needed was the facts generated at the time of his arrest to suggest and corroborate that there was that encapsulated delusional structure, which was in black and white in those reports. As to the mistake of fact, that was excluded first. And then after that, my proposed mistake of fact was excluded first. After that, I said, well, Your Honor, then, give me the next one as a defense theory of the case instruction. And it's true. I proposed several that set forth the defense theory of the case. The problem is that one of them, and the one that was given, just generally says you have to have specific intent, criminal intent, which is a fairly nebulous concept. What does that mean to lay people, to regular jurors, specific intent to break the immigration laws? What I needed was some teeth, was an exact instruction that helped them apply the facts they were given to the law as it exists in this circuit. And where the rubber met the road, I say again in this case, was that he thought he had permission, and permission is an element. It's a mistake of fact. That was the vehicle that was necessary to let the jury deliberate upon the exact evidence that was permitted. They could believe it. They could not believe it. But they needed a legal framework more than just general criminal intent with which to look at that. I would just cite the courts to Zuniga and to Escobar-DeBrite, which are the cases that say that when you deny a defense theory of the case instruction like that, it is not harmless error. And I believe it was Escobar-DeBrite, and if not, it was Zuniga. These are in your brief, I think. Correct. You're well over your time. Very well. I'll stop. Thank you very much. Thank you, Your Honors. We thank both counsel for their arguments, and the Court is adjourned for the day.
judges: Farris, Thompson, Bybee